**TA INSTRUMENTS, INC., Plaintiff,**

v.

**THE PERKIN–ELMER CORPORATION, Defendant.**

No. CIV.A.95–545–SLR.

United States District Court, D. Delaware.

July 31, 2003.

Richard K. Herrmann, Esquire and Mary B. Matterer, Esquire of Blank Rome LLP, Wilmington, Counsel for Plaintiff. Of Counsel: Lawrence J. Gotts, Esquire, Aslan Baghdadi, Esquire and David C. Issacson, Esquire of Shaw Pittman LLP, McLean, Virginia.

Richard L. Horwitz, Esquire of Potter Anderson & Corroon LLP, Wilmington, Counsel for Defendant. Of Counsel: Walter E. Hanley, Jr., Esquire, James Galbraith, Esquire, Mark M. Supko, Esquire and Jeffery S. Ginsberg, Esquire of Kenyon & Kenyon, New York, New York.

### AMENDED OPINION*

ROBINSON, Chief Judge.

## I. INTRODUCTION

On September 7, 1995, plaintiff TA Instruments, Inc. ("TA") filed this action against defendant The Perkin–Elmer Corporation ("PE"), alleging infringement of certain claims of United States Patent Nos. 5,224,775 (the " '775 patent"), 5,346,-306 (the " '306 patent"), and 5,439,291 (the " '291 patent") (collectively, the "TA patents"). Generally speaking, these patents disclose an analytical technique using a differential scanning calorimeter whereby a material is driven through a transition by an independent physical parameter, such as temperature, in order to study the material's properties.

PE counterclaimed alleging infringement of certain claims of United States Patent No. 4,246,641 (the " '641 patent"). The '641 patent covers a device for heating and cooling a sample to a desired temperature.

The TA patents were previously found to be infringed by PE's products. The parties tried the issues of damages for the infringement of the TA patents and infringement of claim 1 of the '641 patent to a jury in September 2002. Currently before the court are the parties' post-trial motions.

## II. BACKGROUND

### A. The '641 Patent

The '641 patent, entitled "Automatic Temperature Calibration of Temperature Analyzers," issued on January 20, 1981. The named inventors are Simon Babil and Andrew R. Muir. The listed assignee is The Perkin–Elmer Corporation.

As interpreted by the Federal Circuit, the '641 patent (also known as "the Babil patent") discloses the following invention:

The Babil patent is directed to a device for heating or cooling a sample to a desired temperature. The Babil device ensures that the sample experiences the precise temperature that is selected. See Babil pat., col. 1., ll. 38–43. The invention automatically calibrates temperature so that the sample temperature is the same as the selected temperature across a range of temperatures. See id.

The specification of the Babil patent describes the calibration process as follows: The device calibrates temperature at three temperatures (the "calibration temperatures") within the temperature range that is going to be used. See id. at col. 1, ll. 49–53. For each of the three temperatures, the device is commanded to reach the selected temperature and permitted to stabilize. Then, the device calculates the difference between the sample temperature and the selected temperature, and uses this difference to calculate an adjusted temperature. The device is then commanded to reach the adjusted temperature and is permitted to stabilize. The device calculates the difference between the sample temperature and the original selected temperature, and uses the difference to calculate a new adjusted temperature. This process is repeated until the sample temperature is the same as the selected temperature. The difference between the selected temperature and the adjust-

ed temperature needed to obtain this result (the "correction factor") is stored in a computer memory. *See id.* at col. 1, l. 53—col. 2, l. 8, col. 3, l. 24—col. 4, l. 19. The circuitry shown in Figure 1 of the patent performs this calibration process.

According to the specification, after calibration has been completed, the correction factors are used to calculate the temperature which the device must be commanded to reach (the "corrected temperature") in order to ensure that the sample experiences the selected temperature across the range of temperatures that is going to be used. *See id.* at col. 5, ll. 22–25. Thus, the correction factors obtained for the three calibrated temperatures are used to calculate the corrected temperatures for all of the selected temperatures. The parties refer to the process of using the stored correction factors to calculate a corrected temperature for a selected temperature as "interpolation." The device shown in Figure 3 of the Babil patent, which includes the circuitry of Figure 1, a memory, and a processor for performing interpolation, performs this interpolation process.

*TA Instruments, Inc. v. The Perkin–Elmer Corporation,* No. 00–1358, 2000 WL 717094, at *13 (Fed.Cir. June 1, 2000).

PE asserted infringement of claim 1 of the '641 patent.

Claim 1 of the '641 patent recites:

1. A thermal analysis system for heating or cooling a test sample to one or more temperatures within a predetermined temperature scale, comprising in combination:

an oven,

a sample disposed in said oven,

first means providing a signal proportional to the temperature of said sample,

second means providing a signal proportional to the temperature of the oven including heater means for raising the temperature of the oven,

computer means disposed between said first and second means for correcting automatically for discrepancies between oven temperatures and desired sample temperatures.

('641 patent, col. 6, lns. 17–30)

The court construed the "computer means" limitation, the sole disputed term of claim 1 of the '641 patent. The court's construction, adopted from the Federal Circuit's claim construction opinion, recited:

The computer means limitation is a means-plus-function clause, meaning that the limitation only covers the structures described in the specification and drawings that perform the claimed function and equivalents thereof. The structure that performs the function of correcting automatically for discrepancies between oven temperatures and desired sample temperatures, as described in the specification of the '641 patent, is the automatic calibration means shown in Figure 1. This structure cycles the device through the steps of commanding the oven to reach a selected temperature, permitting the sample temperature to stabilize, and comparing the sample temperature to the selected temperature, etc., until the sample temperature reaches the selected temperature. This structure corrects automatically for discrepancies between oven temperatures and desired sample temperatures by adjusting the temperature the oven is commanded to reach until the sample experiences the selected temperature.

(D.I. 509 at 1839–40)

**B. The Accused Product**

PE alleged that TA's thermal analysis instruments with the "isotrack" mode of operation infringe claim 1 of its '641

patent. The isotrack software program operates to control the thermal analysis instrument to ensure that the sample experiences the selected temperature. First, the oven is commanded to reach the selected temperature. Next, the system waits until the sample temperature has stabilized. Then, the system determines the difference between the sample temperature and the selected temperature. Finally, the system commands the oven to reach a temperature that is the selected temperature plus the difference between the sample temperature and the selected temperature. Isotrack repeats this process until the sample temperature is the same as the selected temperature.

## C. Procedural History

This case has nearly an eight-year history. Suit was filed by TA on September 7, 1995 and PE counterclaimed. Following the court's claim construction, PE conceded that it could not establish infringement under the adopted construction. The court entered final judgment of non-infringement on the '641 patent. The issue of infringement of the TA patents by PE's Dynamic Differential Scanning Calorimeters ("DDSCs") was submitted to a jury. In January 1998, the jury found that claim 73 of the '291 patent was infringed, but the asserted claims of the '755 and '306 patents were not infringed. The jury also found that none of the asserted claims were invalid. The court granted TA's motion for judgment as a matter of law, finding that claim 17 of the '775 patent and claims 1, 11, 21, 37 and 41 of the '306 patent were also infringed. *See TA Instruments, Inc. v. Perkin–Elmer Corp.,* No. 95–545–SLR, 1998 WL 883446 (D.Del. December 7, 1998). The court further found that a new trial was warranted on the issues of damages and willfulness. Following appeal, the Federal Circuit affirmed the court's judgment with respect

to infringement of the TA patents. *See TA Instruments,* 2000 WL 717094.

The Federal Circuit reversed the court's decision with respect to the claim construction of the '641 patent and remanded the case for further proceedings. Pursuant to the Federal Circuit's claim construction, the '641 patent was submitted to the jury in September 2002, along with the issue of damages for the infringement of the TA patents. The jury returned a verdict of non-infringement and no invalidity of the '641 patent. The jury also awarded damages of approximately $13 million for the infringement of the TA patents.

## III. STANDARDS OF REVIEW

### A. Motion for Judgment as a Matter of Law

To prevail on a renewed motion for judgment as a matter of law following a jury trial, the moving party " 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.' " *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed.Cir.1984)). " 'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." *Perkin–Elmer Corp.,* 732 F.2d at 893. In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.,* 926 F.2d 1344, 1348 (3d Cir.1991); *Perkin–Elmer*

*Corp.*, 732 F.2d at 893. The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin–Elmer Corp.*, 732 F.2d at 893. In sum, the court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed.Cir.1998).

### B. Motion for a New Trial

■ Federal Rule of Civil Procedure 59(a) provides, in pertinent part:

A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed.R.Civ.P. 59(a). The decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282 (3d Cir.1993); *LifeScan Inc. v. Home Diagnostics, Inc.*, 103 F.Supp.2d 345, 350 (D.Del.2000), *aff'd per curiam*, Nos. 00–1485, 00–1486, 13 Fed.Appx. 940 (Fed.Cir. 2001) (citations omitted). Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly-discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See Zarow–Smith v. N.J. Transit Rail Operations*, 953 F.Supp. 581, 584 (D.N.J.1997) (cita-

tions omitted). The court must proceed cautiously, mindful that it must not substitute its own judgment of the facts and the credibility of the witnesses for those of the jury. The court should grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand. *See Williamson*, 926 F.2d at 1352; *EEOC v. Del. Dep't of Health and Soc. Servs.*, 865 F.2d 1408, 1413 (3d Cir.1989).

### IV. PERKIN–ELMER'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW REGARDING INFRINGEMENT OF THE '641 PATENT AND MOTION FOR NEW TRIAL

■ A determination of infringement requires a two-step analysis. First, the court must construe the asserted claims so as to ascertain their meaning and scope. Second, the claims as construed are compared to the accused product. *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1355 (Fed.Cir.2000). Claim construction is a question of law while infringement is a question of fact. *See id.* To establish literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995). An accused product that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused product either literally or equivalently. *See Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817, 826 (Fed.Cir.1999).

■ The jury concluded that TA's thermal analysis instruments with the "isotrack" mode of operation did not infringe claim 1 of the '641 patent. In its motion for judgment as a matter of law for infringement of the '641 patent, PE contends

that under the Federal Circuit's claim construction (adopted by the court) the structure of the computer means limitation does not include memory 36, subtractor 30 or the gating operation 40 shown in figure 1. PE further contends that, under this claim construction, TA's thermal analysis instruments with the "isotrack" mode of operation literally infringe claim 1 of the '641 patent. Figure 1, illustrated below, is the first structure identified by the Federal Circuit as the structure of the computer means limitation.[1]

1. PE does not assert that the TA thermal analysis instruments with the "isotrack" mode of operation infringe claim 1 under the second structure of the computer means limitation identified by the Federal Circuit (shown in figure 3 of the '641 patent).

TA responds that PE's argument is based on a newly asserted and incorrect claim construction. The court agrees. The Federal Circuit's opinion is the law of the case. The Federal Circuit stated that "[t]he specification of the Babil patent describes two structures that perform this function. The first structure is the 'automatic calibration means' shown in Figure 1." *TA Instruments*, 2000 WL 717094, at

*15 (emphasis added). The Federal Circuit did not indicate that any part of figure 1 was not part of the structure.

PE asserts that the Federal Circuit's description of the operation of the system illustrates that memory 36, subtractor 30 and the gating operation 40 are not required. PE further points to the Federal Circuit's description of the second structure, which specifically calls out the need for memory 36. Regardless of the merits of PE's claim construction arguments, the court cannot read between the lines of the Federal Circuit's opinion in the manner advocated by PE. The Federal Circuit twice stated that the structure associated with the computer means limitation is figure 1. *See TA Instruments,* 2000 WL 717094, at *15, 16 ("The first structure is the 'automatic calibration means' shown in Figure 1.... The specification describes two structures that perform this function, the structure of Figure 1 ...").

Furthermore, even if the court were inclined to agree with PE with respect to the interpretation of the Federal Circuit's opinion, PE has waived this argument. PE has repeatedly argued that the first structure was simply figure 1. During the first trial, PE argued the structure was figure 1.

> The Court: [W]hat would you say if I asked you what's the structure?
> Mr. Goodwin: Yes, it is figure 1 ...

> .    .    .    .    .

> The Court: [W]hat's the structure? I think you've said the structure is [the] automatic calibration system in figure 1.
> Mr. Goodwin: It is figure 1.

(D.I. 314 at 2335) PE maintained this argument on appeal to the Federal Circuit. (D.I. 532, Ex. D at 58, 62 ("This structure is the programmed microprocessor implementation of the circuitry of Fig. 1.... The disclosed structure is the calibration circuit of Fig. 1."); D.I. 532, Ex. E at 17 ("Here, the issue is what structure corresponds to the 'computer means ... for correcting automatically for discrepancies between oven temperatures and desired sample temperatures.' This is the circuitry of Fig. 1[.]")) PE did not argue, prior to the second trial, that the structure was anything less than what is shown in figure 1 of the '641 patent.

■ PE's argument to exclude memory 36, subtractor 30 and the gating operation 40, regardless of the merits, comes too little, too late. A patentee cannot be permitted to continually revise claim construction throughout the course of litigation. *See Finnigan Corp. v. International Trade Com'n,* 180 F.3d 1354, 1363 (Fed. Cir.1999) ("A party's argument should not be a moving target."). This is especially true when the case has been reviewed by the appellate court and remanded to the district court, as the appellate court's opinion becomes the law of the case. *See Intergraph Corp. v. Intel Corp.,* 253 F.3d 695, 697–98 (Fed.Cir.2001) (citing *DeLong Equipment Co. v. Washington Mills Electro Minerals Corp.,* 990 F.2d 1186, 1196 (11th Cir.1993) ("the general rule is that 'an appellate court's decision of issues must be followed in all subsequent trial or intermediate appellate proceedings in the same case' except when there are 'the most cogent of reasons' "); *United States v. White,* 846 F.2d 678, 684 (11th Cir.1988) (the doctrine of law of the case encompasses not only matters decided explicitly in earlier proceedings, but also matters decided by necessary implication)); *see also Xerox Corp. v. 3Com Corp.,* 2003 WL 1870896, at *3 (Fed.Cir. Feb. 20, 2003) ("That claim construction was binding on the district court on remand as law of the case and is also binding on us.").

PE's motion for judgment as a matter of law is based on the contention that memory 36, subtractor 30 and the gating operation 40 are not part of the first structure.

While PE attempts to fit its argument within the claim construction provided to the jury, no reasonable jury could have understood the first structure to be anything less than figure 1. This claim construction was required based on the law of the case as established by the Federal Circuit and PE's arguments with respect to the claim construction throughout this litigation. PE's motion for judgment as a matter of law regarding infringement of the Babil patent and motion for new trial are denied.[2]

## V. PERKIN–ELMER'S MOTION FOR JUDGMENT AS A MATTER OF LAW REGARDING PRICE EROSION DAMAGES AND MOTION FOR NEW TRIAL ON DAMAGES

### A. PE's Motion for Judgment as a Matter of Law on Price Erosion Damages

■ The jury awarded TA approximately $2.8 million in price erosion damages for PE's infringement of the TA patents. PE argues that TA failed to introduce evidence sufficient to support a finding of price erosion. PE asserts that TA only analyzed the discount rates and that the net price of TA's Modulated Differential Scanning Calorimeter ("MDSC") actually went up during the period of infringement, not down. TA responds that it introduced sufficient evidence to support a finding of price erosion damages.

TA's MDSC's were sold to customers on a list price basis. Each customer received a discount off the list price to determine the net price to the customer for each order.[3]

TA argues that its damages expert, Mr. Sims, employed the following methodology to calculate the amount of price erosion:

First he determined the size of the discounts that TA offered in the U.S. in 1993 and 1994, prior to PE's infringement (excluding price erosion due to Seiko). Then he determined the size of the discounts TA was forced to offer during PE's infringement in '95–'97. He then calculated the amount of price erosion from the difference between discounts in the pre-infringement and during-infringement periods.

(D.I. 533 at 10; D.I. 505 at 573, 623–24; PX 801, 815, 816)

The problem with this methodology, as recognized by PE, is that Mr. Sims does not take into account the difference in the list price from the pre-infringement period to the infringement period. As explained by PE's damages expert, Dr. Frishberg, this methodology fails to determine whether the net price has actually eroded. "First of all, an increased discount will only tell you that the price is actually discounted only if they start from the same level. So, if something is discounted 10 percent from $10 and 20 percent from $10, then you know that the price has declined, but if something is . . . discounted 10 percent from $10 and then later on it's discounted 30 percent from $20, the price [has] not declined." (D.I. 506 at 943)

---

2. PE also requests the court grant a new trial based on TA's reference to the court's decision on willful infringement during closing argument. PE's motion is denied. When reviewing the whole case, the court finds that the jury was properly focused by the instructions and verdict form.

3. Evidence was presented that TA's method of discounting changed from the pre-infringement period to the infringement period. This change in the manner of pricing may affect the result of the net price and, thus, the determination of whether the price actually eroded. It does not, however, change the court's determination as to whether TA failed to provide evidence on which a reasonable jury could base its price erosion damages award.

While TA provided evidence that the discount rate increased, TA failed to provide evidence that the **net price of the MDSC's actually eroded.** DR. Frishberg's example illustrates that an increased discount rate does not necessarily equate to a reduction in price. TA had the burden to "establish the amount of price reduction." *Vulcan Engineering Co., Inc. v. Fata Aluminium, Inc.,* 278 F.3d 1366, 1377 (Fed.Cir.2002). In the case at bar, where the patentee's product was available on the market prior to the entry of the infringer, the patentee has an identifiable price from which he must show price erosion. TA, however, focused only on the increased discount rate and improperly presumed price erosion.

TA's evidence of: (1) PE's price erosion; (2) the conclusory statements of TA employees that they had to reduce prices; and (3) the supposition that competition would cause a decrease in prices, does not prove that the price of the TA's MDSC **actually** eroded.[4] This evidence may support a finding that if the price eroded it was due to PE's infringement, *see id.,* but the evidence does not support a finding that the price actually eroded. No reasonable juror could find TA's evidence sufficient to support a finding of price erosion damages. PE's motion for judgment as a matter of law regarding price erosion damages is granted and the jury's award of price erosion damages is vacated.

## B. PE's Motion for New Trial on Damages

■ PE argues that the court erroneously allowed TA to present evidence re-garding PE's willful infringement. PE, at the eleventh hour, was forced to stipulate that it had willfully infringed TA's patents with post-injunction manufacturing of the infringing DDSC's. (D.I. 509 at 187) Through its stipulation, PE attempted to preclude testimony from the jury regarding its willful infringement. The court initially held that the post-injunction sales were not relevant to any issue before the jury, but noted that "if PE's witnesses get on the stand and say there was little demand because it wasn't that important, [then] the fact of the [post-injunction] sales is relevant cross examination." (D.I. 504 at 201)

The court was clear that the post-injunction sales were probative of the level of demand for the invention. PE knew there was a fine line not to cross or the door would be open to testimony regarding the post-injunction sales and willful infringement. PE's counsel immediately crossed the line with its opening statement.* [5] The court held that "[PE's] opening was absolutely inappropriate." (*Id.* at 254) Thereafter, TA was permitted to present evidence regarding the post-injunction sales and willful infringement.

Later in the trial, the court directed TA to discontinue any further testimony regarding the post-injunction sales, but again drew a line noting that the sales would again become relevant if PE elicited testimony regarding the level of demand. PE's witnesses subsequently testified that the invention was not important. Thus, the court again held that the post-injunction sales were probative and relevant, stating:

4. TA's conclusory statement in its brief that it could have charged higher prices but for PE's infringement is not supported by any evidence beyond mere speculation. TA's product enjoyed sales prior to PE's infringement. No evidence was presented that TA could have successfully raised prices in the absence of the PE's infringement. *See Vulcan,* 278 F.3d

at 1377 ("For price erosion damages the patentee must show that, but for the infringement, it would have been able to charge and receive a higher price.")

5. * The court notes that PE's counsel on the post-trial motions currently before the court are not the same counsel PE had at trial.

I said that willfulness truly has no relevance to the case at this point except as to demand, and [PE's counsel] represented to the court that his witnesses were not going to testify that there was no demand. Contrary to [PE's counsel's] representations, although he tried to fix it with a curative, he obviously didn't prepare his witnesses correctly and I hold that they did open the door.... If it's a messy record, it has nothing to do with the court. It has everything to do with the way this case has been tried.

(D.I. 506 at 844)

Upon review of the entire record, it is clear that the court appropriately balanced the probative value of the post-injunction sales against their prejudicial effect. The court bent over backwards attempting to keep this evidence from being over emphasized. The fact that PE continually opened the door is not the fault of the court, but the fault of PE's own counsel and witnesses. The court committed no error that requires a new trial. PE's motion for a new trial on damages is denied.

## VI. TA INSTRUMENTS' MOTION FOR ENHANCED DAMAGES AND ATTORNEYS' FEES

■ TA requests that the court grant enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284, 285. TA argues that such an award is appropriate based PE's willful infringement and bad faith litigation conduct. PE argues that this case is not appropriate to award enhanced damages.

As previously noted, PE stipulated that it had willfully infringed TA's patents with post-injunction manufacturing of the infringing DDSCs. (D.I. 509 at 187) PE's stipulation establishes the culpability requirement for enhanced damages. See Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed.Cir.1996). Thus, the court must determine, "exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances." Id. (citing Read Corp. v. Portec, Inc., 970 F.2d 816, 826–27 (Fed. Cir.1992)).

PE's willful infringement occurred after the court adjudicated the TA patents infringed and after the court issued an injunction against further infringement. As such, PE's willful infringement is particularly egregious. Apparently, PE's intent was to relocate a portion of the manufacturing of the infringing DDSCs to avoid further infringement.[6] (D.I. 506 at 885–86) PE failed to properly execute this plan, thus, infringing the TA patents after the injunction issued. PE argues that the willful infringement sales were inadvertent and lie at the least culpable end of the spectrum of willfulness. Faced with a court judgment and injunction, PE's failure to ensure execution of the purported infringement avoidance plan is highly culpable. Under these circumstances, an adjudicated infringer cannot claim good faith willful infringement. The sole factor in favor of mitigating the enhanced damages is the fact that, in the end, PE stipulated to willful infringement rather than force additional wasted time and resources by requiring TA to prove willfulness.

Based on the totality of the circumstances, the court finds PE's willful infringement highly culpable. PE does not

---

6. The parties disagree with respect to whether, if PE's plan were implemented, PE would infringe the TA patents under 35 U.S.C. § 271(f). PE's planned manufacturing relocation has not occurred. Thus, the matter of this hypothetical infringement is not properly before the court and the court makes no findings as to whether such relocation would infringe the TA patents under 35 U.S.C. § 271(f).

dispute that 66 of the 429 infringing sales occurred post-injunction. (D.I. 534 at 6) The court shall increase the damages award by a factor of two for the post-injunction infringing sales.[7]

■■■ TA also requests attorneys' fees under 35 U.S.C. § 285. TA argues that this case is exceptional based on PE's willful infringement and ligation misconduct. TA's strongest argument for attorneys' fees is based on PE's discovery abuse in failing to timely disclose its willful infringement.

TA pursued discovery of PE's post-injunction sales through numerous letters from TA seeking to enforce the court's order to update sales on allegedly infringing products. (D.I.529, Ex. 13, 14) Unfortunately, this letter writing campaign did not succeed in obtaining the information. The court was forced to hold a telephone conference on the eve of trial and then a further evidentiary hearing delaying the trial for one day before PE finally discovered it had willfully infringed the TA patents. During the evidentiary hearing, PE's witness admitted he had not even been asked to provide information regarding post-injunction sales until approximately the Friday before trial. (D.I. 503 at 82–85)

From the start, the court warned that "[d]epending on the outcome of that discovery and who is, in my view, wasting my time, whether it is TA for bringing up a frivolous objection, or whether it is Perkin–Elmer for conducting infringing activities in the face of an injunction, I will decide how to sanction what party at that point. But there will be sanctions, whether it is time, whether it is money, I am not quite sure what." (D.I. 503 at 3) The court finds that monetary sanctions are appropriate for PE's discovery abuse. The court shall sanction PE $25,000 for its abuse of the discovery process resulting in wasted time and resources of TA and the court.[8]

■■■ The parties spend considerable briefing reviewing each other's additional bad litigation conduct. (D.I. 528 at 9–34; D.I. 534 at 14–32; D.I. 541 at 12–26) The court finds that the parties have demonstrated that neither party has exemplified good litigation conduct throughout this case. Although PE's conduct may be more reprehensible, it is only so by a matter of degree. Thus, the court finds that additional sanctions or attorneys' fees are not appropriate.

## VII. TA INSTRUMENTS' MOTION FOR DECLARATION OF CONTEMPT AND MODIFICATION OF THE MARCH 1999 INJUNCTION

■■■ TA argues that PE should be held in contempt for violation of the injunction.

---

7. The jury awarded damages of $10,542,661.50 due to lost profits and reasonable royalty. The jury's award was based on 429 infringing units. The pro rata share of damages attributable to the post-injunction sales is ($10,542,661.50) × (66/429) = $1,621,947.92 and the pro-rata share attributable to pre-injunction sales is ($10,542,-661.50) × (363/429) = $8,920,713.58. The total damages award not considering interest is ($1,621,947.92 × 2) + $8,920,713.58 = $12,164,609.42.

· TA also requests enhanced damages for the sales that occurred after judgment but prior to the injunction. PE has not stipulated to these sales as willful infringement. Furthermore, TA first requested these damages in its reply brief, thus, failing to give PE a chance to respond. (D.I. 541 at 24–25) The court declines to award increased damages for the post-judgment, pre-injunction sales under these circumstances.

8. PE is to pay TA $12,500 as compensation for attorneys' fees required to pursue discovery of the post-injunction sales. PE is to pay to the court $12,500 as sanctions for the wasted time and resources of the court.

TA further requests that the court modify the injunction to expressly enjoin PE from infringing the TA patents in violation of 35 U.S.C. § 271(f). PE asserts that contempt damages are not necessary and the language of the injunction proposed by TA is too broad.

The court finds that PE is in contempt. However, further damages are not warranted as the court has already taken PE's conduct into consideration in assessing willful infringement damages. The court further finds that a modification to the injunction is appropriate to expressly enjoin PE from infringing under 35 U.S.C. § 271(f)(1). The modified injunction, to be included in the court's order, shall read as follows:

> Defendant The Perkin–Elmer Corporation ("Perkin–Elmer"), its officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby enjoined against infringing, or inducing or contributing to the infringement of, claim 17 of U.S. Patent No. 5,224,775; claims 1, 11, 21, 37, or 41 of U.S. Patent No. 5,346,306; and claim 73 of U.S. Patent No. 5,439,291 from and after the date hereof and until such time as the last of such patents expires, by making, using, offering for sale, selling, distributing or importing into the United States, without authority, Perkin–Elmer's Dy-namic Differential Scanning Calorimetry Accessory (or any colorable differences thereof) ("DDSC Accessory") and any differential scanning calorimeters, including Perkin–Elmer's DSC 7 and Pyris DSC Products, that incorporate a DDSC Accessory, or by supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States.[9]

### VIII. TA INSTRUMENTS' MOTION FOR PREJUDGMENT INTEREST

■ The parties do not dispute that prejudgment interest is appropriate in this case. The parties' dispute is with respect to the interest rate and methodology employed in calculating the prejudgment interest. However, as TA has illustrated, properly calculating the prejudgment interest using PE's methods results in a higher amount of prejudgment interest.

The court finds that prejudgment interest is properly calculated using the actual average prime rate during the damages period. As of February 6, 2003, the total prejudgment interest on the lost profits and reasonable royalty damages is

9. As previously noted, the parties disagree with respect to whether, if PE's infringement avoidance plan were implemented, PE would infringe the TA patents under 35 U.S.C. § 271(f). PE's planned manufacturing relocation has not occurred. Thus, the matter of this hypothetical infringement is not properly before the court and the court makes no findings as to whether such relocation would infringe the TA patents under 35 U.S.C. § 271(f).

The parties also debate whether the term "components of a patented invention" in 35 U.S.C. § 271(f)(1) refers to components of the infringing products or limitations of the infringed claims. Again, this discussion is hypothetical at this time and the court cannot opine on the application of section 271(f)(1). The current order enjoins PE from infringing under 35 U.S.C. § 271(f)(1). If the parties' debate becomes concrete in the future the court will address the application of the statute at that time.

$4,867,746.00. (D.I.541, Ex. A–1) Thereafter, prejudgment interest shall be accrued at $1,790.56 per day.[10]

## IX. CONCLUSION

For the reason's stated, PE's motion for judgment as a matter of law regarding infringement of the '641 patent, motion for new trial regarding infringement of the '641 patent and motion for new trial on damages are denied. PE's motion for judgment as a matter of law regarding price erosion damages is granted. TA's motion for enhanced damages and attorneys' fees, motion for declaration of contempt and modification of the March 1999 injunction, and motion for prejudgment interest are granted. An appropriate will issue.

## ORDER

At Wilmington, this 31st day of July, 2003, consistent with the opinion issued this same day;

IT IS ORDERED that:

1. PE's motion for judgment as a matter of law regarding infringement of the '641 patent (D.I.520) is denied.

2. PE's motion for new trial regarding infringement of the '641 patent (D.I.520) is denied.

3. PE's motion for new trial on damages (D.I.522) is denied.

4. PE's motion for judgment as a matter of law regarding price erosion damages (D.I.522) is granted. The jury's award of price erosion damages is vacated.

5. TA's motion for enhanced damages and attorneys' fees (D.I.527) is granted. PE shall pay an additional $1,621,947.92 in enhanced damages. PE shall pay TA

$12,500 in attorneys' fees and pay the court $12,500 in sanctions.

6. TA's motion for declaration of contempt and modification of the March 1999 injunction (D.I.525) is granted.

7. TA's motion for prejudgment interest (D.I.524) is granted. PE shall pay $4,867,746.00 in prejudgment interest through February 6, 2003 and $1,790.56 per day thereafter.

IT IS FURTHER ORDERED that defendant The Perkin–Elmer Corporation ("Perkin–Elmer"), its officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby enjoined against infringing, or inducing or contributing to the infringement of, claim 17 of U.S. Patent No. 5,224,-775; claims 1, 11, 21, 37, or 41 of U.S. Patent No. 5,346,306; and claim 73 of U.S. Patent No. 5,439,291 from and after the date hereof and until such time as the last of such patents expires, by making, using, offering for sale, selling, distributing or importing into the United States, without authority, Perkin–Elmer's Dynamic Differential Scanning Calorimetry Accessory (or any colorable differences thereof) ("DDSC Accessory") and any differential scanning calorimeters, including Perkin–Elmer's DSC 7 and Pyris DSC Products, that incorporate a DDSC Accessory, or by supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would in-

---

10. Daily interest = ((($8,767,661.50 + 1,775,000.00 + $4,867,746.00) × $(1.0425)^{(328/365)}$)—($8,767,661.50 + 1,775, 000.00 + $4,867,746.00))/(328) = $1,790.56 (D.I.541, Ex. A–14)